UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHAUN MICHAEL SNYDER                                   CIVIL ACTION

VERSUS                                                  NO. 20-2158-DMD

MAJ. STEPHEN BERGERON, ET AL.

## ORDER AND REASONS

Shaun Michael Snyder, a state pretrial detainee, filed this federal civil action pursuant to 42 U.S.C. § 1983. In this lawsuit, he claimed that the defendants failed to take proper precautions to protect inmates at the Terrebonne Parish Criminal Justice Complex ("TPCJC") from exposure to COVID-19.[1]

Currently, only plaintiff's claims against defendants Stephen Bergeron and Jerry Larpenter remain.[2] Plaintiff stated his claim against Bergeron as follows: "Major Bergeron – Have been aware of the outbreak of the covid 19 virus in this facility. Not following CDC guidelines, not testing new inmates, overpopulating dorms and not providing the proper PPE during a crisis pandemic." He stated his claim against Larpenter as follows: "Not compelling with CDC guidelines rules and regulations or making no subordinates to follow those same guidelines which led me to catching this deadly virus."[3]

---

[1] Rec. Doc. 1.
[2] In the original complaint, plaintiff also named Richard Neal as a defendant. However, the claims against Neal have already been dismissed with prejudice. Snyder v. Bergeron, Civil Action No. 20-2158, 2021 WL 784813 (E.D. La. Jan. 21, 2021), adopted, 2021 WL 780751 (E.D. La. Mar. 1, 2021); Rec. Docs. 15 and 16.
[3] Rec. Doc. 1, p. 5.

Bergeron and Larpenter have filed a motion arguing that they are entitled to summary judgment on those claims based on qualified immunity.[4] Plaintiff has opposed that motion.[5] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[6]

Regarding qualified immunity, the United States Fifth Circuit Court of Appeals has explained:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. It protects all but the plainly incompetent or those who knowingly violate the law.
> Our qualified-immunity inquiry is two-pronged. First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. Second, we ask whether the right was clearly established. We can analyze the prongs in either order or resolve the case on a single prong.

Cunningham v. Castloo, 983 F.3d 185, 190-91 (5th Cir. 2020) (citations and quotation marks omitted).

"When an official raises qualified immunity on summary judgment, … the plaintiff bears the burden of showing that the defense does not apply." Id. at 191. In addition, the traditional burdens imposed on the parties are altered. Specifically, the United States Fifth Circuit Court of Appeals has explained:

> Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden.
> A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right – that is, the plaintiff must make this showing whether or not qualified immunity is involved. But when qualified immunity is involved, at least in this circuit, a plaintiff has the additional

---

[4] Rec. Doc. 23.
[5] Rec. Doc. 30.
[6] Rec. Doc. 29.

burden to show that the violated right was "clearly established" at the time of the alleged violation.

This expanded substantive burden isn't the only special feature of qualified immunity. Burden shifting changes, too. Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial. For a defendant, this means showing that the record cannot support a win for the plaintiff – either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim. The defendant can show this by introducing undisputed evidence or by pointing out an absence of evidence to support the plaintiff's case. If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there is a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.

But that changes with qualified immunity. When a public official makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available. In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law.

Once the burden is on the plaintiff, things briefly sound familiar again: The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. That would be the same if the plaintiff did not face qualified immunity. But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to identify a case – usually, a body of relevant case law – in which an officer acting under similar circumstances was held to have violated the Constitution. While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. This leaves the rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear even though existing precedent does not address similar circumstances.

Moving from the bar to the bench, qualified immunity similarly changes the court's normal task on summary judgment. A court decides whether summary judgment is appropriate by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor (so far normal), then determining whether the plaintiff can prove a constitutional violation (still normal) that was clearly established (not normal).

State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 329-30 (5th Cir. 2020) (footnotes, quotation marks, brackets, and ellipsis omitted).

Fairly construed, plaintiff's claims are ones alleging that the defendants failed to take appropriate precautions to protect him from COVID-19. He is a pretrial detainee, and it is beyond cavil that the Fourteenth Amendment imposes on penal officials a duty to provide pretrial detainees in their custody "with basic human needs, including … protection from harm, during [their] confinement." Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996). Regarding such claims, the United States Fifth Circuit Court of Appeals has held that "[t]o establish a failure-to-protect claim under § 1983, [an inmate] must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995).

The first element poses no great obstacle in a COVID-19 case. "There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates." Valentine v. Collier, 956 F.3d 797, 801 (5th Cir. 2020).

However, the second element, "deliberate indifference," is normally more problematic for plaintiffs because "[d]eliberate indifference is an extremely high standard to meet." Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). Indeed, "[i]n order to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Neals, 59 F.3d at 533 (internal quotation marks omitted). Accordingly, both "[a]ctual knowledge and appreciation of the risk are required." Smith v. Jaramillo, 394 F. App'x 183, 185 (5th Cir. 2010). Moreover, "[a]ctions and decisions by officials that are merely inept, erroneous,

ineffective, or negligent do not amount to deliberate indifference. To reach the level of deliberate indifference, official conduct must be 'wanton,' which is defined to mean 'reckless.'" Alderson v. Concordia Parish Correctional Facility, 848 F.3d 415, 420 (5th Cir. 2017) (citation and quotation marks omitted). Further, "[d]eliberate indifference must be viewed from [the defendant's] perspective at the time in question, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998); accord Dangerfield v. Dyson, Civ. Action No. 05-0650, 2008 WL 718114, at *3 (E.D. La. Mar. 14, 2008). Lastly, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they **responded reasonably** to the risk, **even if the harm ultimately was not averted**." Farmer v. Brennan, 511 U.S. 825, 844 (1994) (emphasis added).

In connection with their motion, the defendants have presented evidence showing that extensive measures were taken to protect the TPCJC inmates from COVID-19. For example, they submitted an affidavit executed by defendant Stephen Bergeron, who stated:

> I am employed by the Terrebonne Parish Sheriff's Office as the Chief of Corrections for the Terrebonne Parish Sheriff's Office which includes overall responsibilities for the Terrebonne Parish Criminal Justice Complex. I hold the rank of Major and, again, I was at all relevant times herein in charge of the facility to ensure that all policies and procedures for the operation of the facility were followed, that the safety and security for employees as well as inmates were provided for, and that inmates receive all constitutional guarantees that they are entitled to within the law. …
> ….
> Beginning in March 2020 our facility began receiving information about the COVID-19 pandemic from the Center of [sic] Disease Control (CDC) as to how to address health problems related to same. Thereafter, in March of 2020 we continued to receive information from the CDC and reached out to the Louisiana Department of Corrections (DOC) for further guidance in dealing with this health issue.
> We encouraged the frequent washing of hands and increased the areas of cleaning within the facility for employees, visitors, and inmates. The temperature of all incoming inmates were taken as well as the temperature of all inmates in the

facility. During that month visitation for all public visits for inmates ceased with only attorney/inmate visits allowed.

In April 2020 all staff and inmates were required to wear masks and that policy continues to date. Beginning in April of 2020 and continuing until this month of May, 2021, decontamination spraying of the entire facility began.

In May 2020 zoom meetings with CDC and DOC, and the Louisiana Department of Health and Hospitals were held to gain additional information and recommendations to help combat the COVID-19 pandemic. In May of 2020 we began a system of trying to quarantine those inmates who had COVID-19 away from other inmates who did not, to the best of our ability, space limitations, and of course maintaining the proper classification level of inmates in the facility for the protection of the inmates.

In June 2020 the spraying/disinfecting of the facility continued. The temperature of all employees at the TPCJC were taken twice a day and all incoming inmates were check [sic] for COVID-19 symptoms including the taking of their temperatures, as well as temperature checks for existing inmates.

In July 2020 the facility protocols for cleaning/disinfecting continued as well as all other protocols that had been in place. Also, all incoming inmates were quarantined for 14 days before placed in general population.

In August of 2020 the TPCJC/facility despite having to be evacuated twice for Hurricanes (Marco and Laura), we required mask mandates for the evacuating inmates whose transportation was handled by both the State of Louisiana Department of Corrections as well as Catahoula Corrections Center. While the inmates were gone for several days on both occasions, the entire TPCJC/facility was sprayed by an environmental company on both absences of the inmates.

Upon the return of the inmates from the evacuations and to-date all COVID-19 protocols continue and are updated on a regular basis by recommendations from the CDC, DOC, the Governor of the State of Louisiana, Louisiana Department of Health and Hospitals, as well as the Louisiana Sheriff's Association, and other sources. Our protection of the staff of the TPCJC as well as the inmates housed in same, continue to be a top priority as the health response to COVID-19 improves.

As to plaintiff Snyder's complaint in his petition filed in July of 2020, it is undisputed and can be clearly seen from the above referenced actions taken by the Correction staff and the medical staff of the TPCJC, that all known and suggested procedures to prevent exposure to and prevention of the spread of COVID-19, within the prison setting of the TPCJC, were taken based upon the best recommendations of the CDC, DOC, the Governor of the State of Louisiana, Louisiana Department of Health and Hospitals, as well as the Louisiana Sheriff's Association.

Furthermore, at the time of plaintiff Snyder's complaint in his petition filed in July of 2020, there existed at the time of his complaint a mask mandate for all staff in the facility, inmates, and visiting attorneys as well as other PPE precautions. Likewise, there existed proper testing procedures for all incoming inmates as well as for inmates in the TPCJC to determine if inmates were ill and then of course, if

they were, appropriate medical treatment was provided. All recommended guide lines [sic] from the CDC, DOC, Louisiana Department of Health and Hospitals, the Governor of the State of Louisiana, as well as the Louisiana Sheriff's Association, have been followed and continue to be followed.

As far as medications for inmates such as Plaintiff Snyder were concerned, medical requests for same have always been timely responded to, and over-the-counter medications for headaches and other types of pain have always been made available. Prescribed medications, if the medical staff deemed same necessary following an inmate's visit with and examination by Medical Staff, would be provided.

Inmate/Plaintiff Snyder's health concerns as well as the health concerns for all inmates within the Terrebonne Parish Criminal Justice Complex have always been a priority under the direction of former Sheriff Larpenter and myself, and that care and concern continues today to ensure that the constitutional rights of all inmates, not only from a medical standpoint, but from all standpoints, are protected.[7]

The defendants also submitted a similar affidavit executed by the TPCJC Medical Administrator, Richard Neal, who stated:

I am employed by the Terrebonne Parish Consolidated Government as the Medical Administrator for the Terrebonne Parish Criminal Justice Complex which includes overall responsibilities for the health care of all inmates housed in said facility. I am tasked with the responsibility to help develop, recommend and implement Health Care Policies and Procedures for the facility to ensure that the health of all inmates are provided for, and that inmates receive all constitutional guarantees that they are entitled to within the law as same relates to their health care.

Beginning in March 2020 Major Stephen Bergeron and I began receiving information about the COVID-19 pandemic from the Center of [sic] Disease Control (CDC) as to how to address health problems related to same and specifically care for inmates housed in a prison setting. Thereafter, in March of 2020 we continued to receive information from the CDC and we reached out to the Louisiana Department of Corrections (DOC) for further guidance in dealing with this health issue.

Major Bergeron and I encouraged the frequent washing of hands and increased the areas of cleaning within the facility for all employees of the facility, visitors, and inmates. The temperature of all incoming inmates was taken by my staff as part of the Booking process as well as the taking of the temperatures of all inmates within the facility. During that month it was also recommended that

---

[7] Rec. Doc. 23-3.

visitation for all public/family visits for inmates be ceased with only attorney/inmate visits allowed.

In April 2020 Major Stephen Bergeron and myself recommended that all staff and inmates within the facility be required to wear masks and that policy continues to date. Beginning in April of 2020 and continuing to date, Parish Government began decontamination spraying of the entire facility. Such decontamination spraying was this month discontinued by Parish Government. Finally, the entire inmate population was tested for COVID-19, and additional testing continues.

In May 2020 zoom meetings with CDC and DOC, and the Louisiana Department of Health and Hospitals were held to gain additional information and recommendations to help combat the COVID-19 pandemic. Such meetings were attended by both medical and corrections staff. In May of 2020 I recommended and Major Bergeron agreed to follow, a system of trying to quarantine those inmates who had COVID-19 away from other inmates who did not, to the best of our ability, space limitations, and of course working with the corrections staff to maintain the proper classification level of inmates in the facility for the protection of all inmates.

Again, in June 2020 the spraying/disinfecting of the facility continued. The temperature of all employees at the facility were taken twice a day and all incoming inmates were checked for COVID-19 symptoms including the taking of their temperatures.

In July 2020 the facility developed protocols for all incoming inmates to be quarantined for 14 days before placed in general population.

During the month of August 2020 testing of inmates for COVID-19 continued with appropriate medical treatment for those found to be positive for same as well as treating those previously diagnosed inmates for COVID-19. Daily spraying continued as a routine and some cells and dorms continued to be quarantined. During this month the TPCJC was evacuated two (2) times for hurricanes to other facilities and inmates were required to wear masks during those evacuations. While the inmates were gone from the facility the entire facility was sprayed two (2) times by an outside environmental company contracted for by the Parish.

From September 2020 through April of 2021 all procedures previously followed by the Corrections Staff and Medical Department continued in order to best protect the inmates in the facility and the staff.

To-date all COVID-19 protocols continue and are updated by recommendations from the CDC, DOC, Louisiana Department of Health and Hospitals, as well as the Louisiana Sheriff's Association, and other sources. Our protection of the staff of the facility as well as the inmates housed in same, continue to be a top priority as the health response to COVID-19 improves to fight this mysterious and deadly disease.

The COVID-19 virus continues to be an important issue for not only the safety and welfare of all inmates in the TPCJC, but for its staff of correctional

officers, medical personnel, visitors who are now being allowed back into the facility/TPCJC to see those incarcerated, and for those in courtrooms where inmates/prisoners are taken for court appearances. We, the employees of the Medical Department, as well as employees of the Corrections Staff, continue to work closely together to provide the best care possible for the inmates of the TPCJC.

As to plaintiff Snyder's complaint in his petition filed in July of 2020, there existed at the time of his complaint a mask mandate for all staff in the facility, inmates, and visiting attorneys as well as other PPE precautions. Likewise, there existed proper testing procedures for all incoming inmates as well as for inmates in the TPCJC to determine if inmates were ill and then of course, if they were, appropriate medical treatment was provided. All recommended guide lines [sic] from the CDC, DOC, Louisiana Department of Health and Hospitals, the Governor of the State of Louisiana, as well as the Louisiana's Sheriff's Association, have been followed and continue to be followed.

To-date while we have experienced COVID-19 cases in the TPCJC/facility, we have experienced no deaths from same nor have we been required to have hospitalize [sic] any inmates from the effects of COVID-19. While we realize such an incident could occur, we believe such a positive record of treatment to be due to the actions taken by corrections staff and medical staff to best protect all of the inmates.

As far as medications for inmates were concerned, medical requests for same have always been timely responded to, and over-the-counter medications for headaches and other types of pain have always been made available. Prescribed medications, if the medical staff deemed same necessary following an inmate's visit with and examination by the Medical Staff, would be provided.

I am aware that during the early stages of the Pandemic, and in particular, as both the Correction Staff and Medical Staff received more information about the possible prevention of COVID-19 in a setting such as the TPCJC, as well as treatment procedures for those infected with the COVID-19 virus, Plaintiff Snyder did contract the virus as indicated in a positive test on him on April 29, 2021. He, plaintiff Snyder, thereafter was monitored on a daily basis, had access to all over the counter meds he needed, and had all necessary medical attention he required. He also recovered fully from same.[8]

To avoid summary judgment based on that evidence, plaintiff must "show that there is a genuine dispute of material fact and that a jury could return a verdict entitling [him] to relief for a constitutional injury." State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 330 (5th Cir. 2020).

---

[8] Rec. Doc. 23-4.

Despite being faced with that burden, plaintiff has submitted no evidence rebutting the foregoing evidence submitted by the defendants. On the contrary, he continues to rely on nothing more than his own vague, often conclusory allegations. For the following reasons, those allegations fall far short of what is required to overcome the defendants' assertion of qualified immunity.

As noted, in his complaint, plaintiff alleged that defendant Bergeron failed to follow "CDC guidelines" and that defendant Larpenter failed to require compliance "with CDC guidelines rules and regulations or mak[e] no subordinates to follow those same guidelines ...."[9] However, there are three immediate problems.

First, even the CDC acknowledged that its guidelines were merely advisory and could not be applied as written in all penal facilities.[10]

Second, courts have expressly held that the CDC's guidelines and the United States Constitution are not coextensive. See Valentine v. Collier, 978 F.3d 154, 164 (5th Cir. 2020); accord Mays v. Dart, 974 F.3d 810, 823 (7th Cir. 2020) ("The CDC Guidelines – like other administrative guidance – do not themselves set a constitutional standard. … [T]hey simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." (quotation marks omitted)). Further, "the constitution does not require prison officials to adopt the CDC guidelines and implement those guidances to satisfy their duty to provide for inmate safety and care within prisons." Young v. Ledet, Civ. Action No. 20-2165, 2021 WL 799683, at *17 (E.D. La. Jan. 15, 2021), adopted, 2021 WL 795981 (E.D. La. Mar. 2, 2021).

---

[9] Rec. Doc. 1, p. 5.
[10] "The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (updates as of June 9, 2021).

Third, the defendants have, as already noted, provided evidence that they in fact **did** seek out and comply CDC guidelines. On the other hand, plaintiff has not referenced any specific guideline provisions, much less presented any rebuttal evidence showing that the defendants failed to comply with them.

Moreover, those purported failures which plaintiff did mention in his complaint fail to rise to the level of constitutional violations for the following reasons.

As to plaintiff's allegation of inadequate COVID testing, it can hardly be disputed that testing kits were in short supply in the early days of the pandemic. And, in any event, the United States Fifth Circuit Court of Appeals has noted that "the CDC guidelines for detention facilities did not require or recommend mass testing" and held that "we are not persuaded that the constitution requires more." Valentine v. Collier, 993 F.3d 270, 286 (5th Cir. 2021).

Plaintiff's allegation that "proper PPE" was not provided fares no better. Although he does not specify the type of PPE he believes should have been provided, he is presumably referring to face masks, the most common form of PPE. If so, the fact that he signed his complaint in June of 2020 is relevant. For example, in a case arising out the Idaho State Correctional Center, a prisoner asserted a § 1983 claim predicated on an allegation that visitors, staff, and inmates were not required to wear masks from **March to June of 2020**. United States District Judge B. Lynn Winmill determined that allegation was insufficient to state a plausible failure-to-protect claim, noting:

> That prison officials did not require face masks for the first few months of the pandemic does not establish deliberate indifference. What we know about COVID-19 and the spread of the novel coronavirus is constantly changing, as new information is released by medical researchers, agencies, and other authorities. At first, it was unclear whether cloth face masks would be particularly effective in curbing the spread of the virus. Of course, we now know that such masks do help

> reduce the risk of transmission. But it was not unreasonable for prison officials to refrain from requiring face masks in the early months of the pandemic, particularly when access to such masks was limited.

Kesling v. Tewalt, Case No. 1:20-cv-00334, 2020 WL 4496495, at *6 (D. Idaho Aug. 4, 2020). The same is true in this case.

Lastly, plaintiff's vague and conclusory allegation that the dorms were "overpopulated" also fails. The mere fact that inmates are confined in overcrowded conditions does not in and of itself amount to a constitutional deprivation. See, e.g., Rhodes v. Chapman, 452 U.S. 337, 347-50 (1981); Castillo v. Cameron County, 238 F.3d 339, 354 (5th Cir. 2001) ("[A]lthough overcrowding may give rise to unconstitutional conditions, overcrowding itself is not per se unconstitutional."); Price v. New Orleans Parish Criminal Sheriff, Civ. Action No. 09-3573, 2009 WL 2139702, at *3 (E.D. La. July 13, 2009). Further, if the Court was intended to construe the contention as one alleging that the purportedly crowded conditions at TPCJC made social distancing more difficult or impossible, the result does not change. Obviously, social distancing is particularly difficult to accomplish in penal institutions, and the mere fact that it was not achieved is an insufficient basis for finding a constitutional violation. See, e.g., Powell v. Inch, Case No. 3:21-cv-363, 2021 WL 1428418, *2 (M.D. Fla. Apr. 15, 2021) ("The fact that inmates and staff … are unable to achieve social distancing does not by itself show prison officials are deliberately indifferent to the risks posed by this unprecedented virus."); Smith v. Jeffreys, No. 20-1421, 2021 WL 918057, at *2 (C.D. Ill. Mar. 10, 2021) ("It has been recognized the prison officials' … failure to adhere to social distancing does not satisfy either the subjective or objective component necessary for deliberate indifference. In sum, plaintiff's general allegations about a lack of social distancing … at the prison do not suggest that the conditions of plaintiff's confinement are inhumane or that defendants

are acting with deliberate indifference to a significant risk of harm to plaintiff's health or safety." (citation and quotation marks omitted)); McCrary v. DeWine, No. 1:20-cv-388, 2021 WL 320737, at *4 (S.D. Ohio Feb. 1, 2021) ("Plaintiffs' general conclusory allegation that the prison system is ill-equipped for social distancing or protecting inmates is insufficient to state a claim."), adopted, 2021 WL 1087465 (S.D. Ohio Mar. 22, 2021); Mayfield v. Peissig, No. 20-cv-269, 2020 WL 3414757, at *2 (W.D. Wis. June 22, 2020) ("[P]laintiff's general allegations about a lack of social distancing … at the prison do not suggest that the conditions of plaintiff's confinement are inhumane or that defendants are acting with deliberate indifference to a significant risk of harm to plaintiff's health or safety."), appeal dismissed, No. 20-1982, 2020 WL 7238281 (7th Cir. Aug. 12, 2020).

For all these reasons, the Court finds that the facts in this case, even when viewed in the light most favorable to plaintiff, simply do not show that the defendants' conduct violated a constitutional right. Therefore, the first prong of the qualified immunity test has not been met, and that alone warrants the granting of the motion for summary judgment.

But, there is also more: Plaintiff likewise has not met the second prong of that test. Again, that second prong requires that a plaintiff show that clearly established law establishes that the unlawfulness of the defendants' conduct was "beyond debate." As noted, to make that showing, a plaintiff must "identify a case – usually, a body of relevant case law – in which an officer acting under similar circumstances was held to have violated the Constitution." State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 329-30 (5th Cir. 2020) (quotation marks, brackets, and ellipsis omitted). Here, plaintiff has identified no such analogous case or body of case law.

13

In conclusion, the Court notes that it is undisputed that plaintiff, like millions of other individuals in this country, unfortunately contracted COVID-19. It is also undisputed that he did so while he was incarcerated at TPCJC. That, however, does not mean that these defendants violated the United States Constitution. Penal officials throughout the nation have faced a monumental task in trying to protect those in their custody from contracting COVID-19 – and these particular defendants have produced evidence that significant measures were in fact taken to try to guard against transmission of the virus at TPCJC. The mere fact that their measures failed to prevent plaintiff from contracting the disease does not mean that that they fell short of their constitutional obligations. Rather, as already explained, the United State Supreme Court has held that prison officials who respond reasonably to a substantial risk to inmate health are not rendered liable simply because "the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

It all boils down to this: Although plaintiff contracted COVID-19 while incarcerated at TPCJC, he simply has not met his burden to show that the evidence is such that a reasonable trier of fact could find in his favor on these claims against these defendants. Therefore, summary judgment is warranted.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment, Rec. Doc. 23, is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's remaining claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the final pretrial conference and the trial scheduled in this case are hereby **CANCELED**.

New Orleans, Louisiana, this seventh day of July, 2021.

_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**
